UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ECOLOGICAL RIGHTS FOUNDATION,

Plaintiff,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Defendant.

Case No. 18-cv-00394-DMR

**ORDER FOLLOWING IN CAMERA REVIEW**

Re: Dkt. Nos. 97, 100

## I.    BACKGROUND

Plaintiff Ecological Rights Foundation ("ERF") and Defendant United States Environmental Protection Agency ("EPA") filed cross motions for summary judgment.  [Docket Nos. 97, 100.]  As described in the court's September 16, 2020 order, their briefs and supporting materials were organized in a way that "seem[ed] engineered to make the court's review of the motions as difficult and complicated as possible," including EPA's submission of a 1172-page unnumbered *Vaughn* index, the parties' inclusion of argument in supporting documents, and their mutual failure to organize their discussion of the withheld documents in a way to facilitate the court's review.  [Docket No. 105.]

The court also noted that EPA's *Vaughn* index was problematic with respect to the requirements of the FOIA Improvement Act of 2016 ("FIA").  The FIA prohibits agencies from withholding information responsive to a FOIA request unless "the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in [5 U.S.C. § 552(b)]; or . . . disclosure is prohibited by law."  5 U.S.C. § 552(a)(8)(A).  In order to meet this "independent and meaningful burden," "an agency must 'identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld

materials' and 'connect[ ] the harms in [a] meaningful way to the information withheld.'" *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019) (quoting *Judicial Watch, Inc. v. U.S. Dep't of Justice*, No. 17-0832 (CKK), 2019 WL 4644029, at *5 (D.D.C. Sept. 24, 2019) ("*Judicial Watch II*"). The court noted that EPA's identified harms "appear[ed] to consist of the type of general explanations and boiler plate language rejected in previous cases." [Docket No. 105 at 2-3 (quotation marks and citations omitted).] In order to get a handle on the parties' chaotic presentations, the court ordered EPA to select 20 examples of withheld documents for in camera review, for which EPA contends that the harm likely to result from disclosure is "obvious" based on the description of the document on the *Vaughn* index and the identified harm. *See Rosenberg v. U.S. Dep't of Def.*, 442 F. Supp. 3d 240, 259 (D.D.C. 2020) (discussing instances where "the withheld information may be so obviously sensitive . . . that a simple statement illustrating why the privilege applies and identifying the harm likely to result from release 'may be enough.'"). It also ordered ERF to identify (and EPA to lodge) ten examples of withheld documents that illustrate its contention that EPA made improper assertions of exemptions and/or insufficient claims of foreseeable harm from disclosure. EPA timely lodged all 30 exemplar documents for in camera review. [*See* Docket Nos. 106-108.]

One of the court's original overarching concerns with EPA's *Vaughn* index was that it used boilerplate language to support the requirements of the FIA. This potentially affects all withheld documents, because even if EPA could meet its burden of establishing that each document is subject to a FOIA exemption, it cannot withhold a document unless it can also make the requisite showing of harm under the FIA. *See Ctr. for Investigative Reporting v. U.S. Dep't of Lab.*, 424 F. Supp. 3d 771, 780 (N.D. Cal. 2019) ("even if information falls within the scope of a discretionary exemption, it cannot be withheld from the public unless the agency also shows that disclosure will harm the interest protected by that exemption" under the FIA). For this reason, the court chose to test this foundational problem by ordering the identification of exemplars as described above. However, having now reviewed the documents submitted for in camera review along with the accompanying *Vaughn* index entries, the court finds that many of EPA's claims of exemption are not supported by the record, by the law, or both.

1    Therefore, in order to move the parties' dispute toward final resolution, the court sets forth

2    rulings on the 30 exemplar documents based on the current record. These benchmark rulings will

3    serve as guidance to the parties with respect to the remaining documents.

4    **II.    DISCUSSION OF THE DOCUMENTS SUBMITTED FOR IN CAMERA REVIEW**

5    EPA withheld the 30 exemplars on the basis of two FOIA exemptions: Exemption 5, which

6    protects from disclosure "inter-agency or intra-agency memorandums or letters which would not

7    be available by law to a party other than an agency in litigation with the agency . . . ," and

8    Exemption 6, which exempts from production "personnel and medical files and similar files the

9    disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5

10   U.S.C. § 552(b)(5), (6). Exemption 5 "protects from disclosure 'those documents normally

11   privileged in the civil discovery context.'" *Our Children's Earth Found. v. Nat'l Marine*

12   *Fisheries Serv.*, 85 F. Supp. 3d 1074, 1086 (N.D. Cal. 2015) (quoting *NLRB v. Sears, Roebuck &*

13   *Co.,* 421 U.S. 132, 149 (1975)). Here, EPA asserts the deliberative process privilege, the attorney-

14   client privilege, and the presidential communications privilege under Exemption 5.

15   The court addresses the documents submitted for in camera review under the claimed

16   exemptions, and where appropriate, discusses the documents in groups.

17   **A.    Exemption 5**

18   **1.    Documents Withheld on the Basis of the Deliberative Process Privilege**

19   EPA withheld 23 of the 30 exemplars on the basis of the deliberative process privilege.

20   The deliberative process privilege protects 'the decision making processes of government

21   agencies' in order to 'prevent injury to the quality of agency decisions." *N.L.R.B. v. Sears,*

22   *Roebuck & Co*., 421 U.S. 132, 150-51 (1975 (quotation marks and citations omitted). "The

23   underlying premise of the privilege is that agency decision-making might be impaired if

24   discussions within the agency were subject to public review, thereby discouraging 'frank

25   discussion of legal or policy matters.'" *In re McKesson Governmental Entities Average*

26   *Wholesale Price Litig*., 264 F.R.D. 595, 600 (N.D. Cal. 2009) (quoting *Sears*, 421 U.S. at 150).

27   The Ninth Circuit has "defined the ambit of the deliberative process privilege . . . narrowly."

28   *Sierra Club, Inc. v. United States Fish & Wildlife Serv*., 925 F.3d 1000, 1011 (9th Cir. 2019). In

order for the deliberative process privilege to apply, "a document must be both (1) predecisional or antecedent to the adoption of agency policy and (2) deliberative, meaning it must actually be related to the process by which policies are formulated." *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1117 (9th Cir. 1988) (quotation marks and citation omitted).

### a. Human Resources and Staffing Decisions Documents

Twelve of the 23 documents that EPA withheld on the basis of the deliberative process privilege can be categorized as documents and communications related to human resources and/or staffing issues. Of the 12 documents, six are related to human resources/staffing issues, while the remaining six are related to EPA's decisions to offer employees early retirement or incentives to voluntarily separate (the "VERA/VSIP offering"). The court addresses each group in turn.

### i. General Human Resources/Staffing Issues

Exemplar 1 is an undated four-page document. EPA's *Vaughn* index describes it as a document that "contains multiple proposals and discussion suggestions from multiple Agency employees regarding proposed restructuring of the Agency, proposed improvements to organizational effectiveness, and other workforce shaping considerations and options." *Vaughn* Index 27. The document reflects ideas and proposals regarding human resources and staffing decisions to improve efficiency, reduce operating costs, and better manage EPA's workforce. According to EPA, the document "reflects pre-decisional deliberations among EPA staff and superiors regarding potential reform and restructuring options for the Agency." *Id.*

Exemplar 1 does not fall within the scope of the deliberative process privilege. It sets out human resources proposals that do not clearly bear on agency policies or programs. *See Nat'l Wildlife Fed'n*, 861 F.2d at 1118 ("Exemption 5 was created to prevent the disruption of a free flow of ideas, opinions, advice and frank discussions within agencies concerning their policies and programs."). The deliberative process privilege "shields from public disclosure confidential inter-agency memoranda on matters of law or policy," and a document is part of the "'deliberative process' as long as it is 'actually . . . related to the process by which policies are formulated.'" *Id.* at 1116, 1118. As one court noted, "[b]ecause the privilege 'is centrally concerned with protecting the process by which *policy* is formulated,' only those materials that bear on the formulation or

exercise of agency policy-oriented judgment fall within the privilege." *Greenpeace v. Nat'l Marine Fisheries Serv.*, 198 F.R.D. 540, 543 (W.D. Wash. 2000) (emphasis in original) (quoting *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992)). "Conversely, when materials could not reasonably be said to reveal an agency's or official's mode of formulating or exercising *policy-implicating judgment,* the deliberative process privilege is inapplicable." *Id.* (emphasis added) (quoting *Petroleum Info. Corp.*, 976 F.2d at 1435).

Exemplar 1 does not bear on "the process by which policy is formulated" or "reveal [EPA's] mode of formulating or exercising policy-implicating judgment," *see Petroleum Info. Corp.*, 976 F.2d at 1435, and EPA does not offer any authority that an agency's process of making human resources decisions is "deliberative" within the meaning of the privilege. *See, e.g., Chattler v. United States*, No. C-07-4040 MMC (EMC), 2009 WL 1313227, at *2 (N.D. Cal. May 12, 2009) (noting that the assertion of the privilege was "inappropriate or . . . at least questionable with respect to what appear to be logistical decisions," including approaches to staffing, as opposed to "policy-type decision[s]"); *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 79 (D.D.C. 2018) (comparing internal deliberations about "a possible new detention operation in the continental United States" with "more benign[ ] categories of withheld deliberative information," such as opinions about the current state of facilities and recommendations and advice about maintenance issues). The relevant portions of the Coogan and White declarations in support of EPA's cross motion for summary judgment do not explain how the personnel decisions discussed in Exemplar 1 are connected in any way to EPA's substantive policy issues or statutory duties. [*See* Docket No. 100-1 (Coogan Decl., Jul. 23, 2020) ¶¶ 54-62; 100-2 (White Decl., Jul. 23, 2020) ¶¶ 35-47.]

Additionally, these declarations do not address an identifiable decision connected to Exemplar 1. The Ninth Circuit has explained that in order to fall within the deliberative process privilege, "[t]he documents must be prepared to assist an agency decision-maker in arriving at a future particular decision, although [courts] need not be able to identify retroactively 'the actual decision that was made' on the basis of the withheld documents." *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 981 (9th Cir. 2009) (quoting *Maricopa Audubon Soc. v. U.S. Forest Serv.*, 108

F.3d 1089, 1094 (9th Cir. 1997)). However, "the absence of an identifiable later decision is of considerable relevance to the deliberative process privilege, as evidence of whether a later decision was indeed under consideration. Otherwise, the privilege would be boundless, as '[a]ny memorandum always will be 'predecisional' if referenced to a decision that possibly may be made at some undisclosed time in the future.'" *Lahr*, 569 F.3d at 981 (quoting *Assembly of State of Cal. v. U.S. Dep't of Com.*, 968 F.2d 916, 921 (9th Cir. 1992)).

Accordingly, on the current record, the court finds that EPA has not established that the deliberative process privilege applies to shield Exemplar 1 from production.

EPA withheld other exemplars that reflect human resources matters on the basis of deliberative process privilege, as follows:

- Exemplar 5 is a June 30, 2017 email chain "regarding a white paper written by [one of the email chain participants] about veterans' employment." *Vaughn* Index 72. EPA redacted portions of two emails on the grounds that they reflect "pre-decisional deliberations among EPA staff and superiors regarding the veterans' employment program as well as what next steps the Agency should take as a result of the findings of the white paper." *Id*. As discussed above, EPA has not established that discussions regarding veterans' employment at EPA in general fall within the deliberative process privilege as they do not bear on "the process by which policy is formulated" or "reveal [EPA's] mode of formulating or exercising policy-implicating judgment." *See Petroleum Info. Corp*., 976 F.2d at 1435. Further, the *Vaughn* index does not provide information about an identifiable later decision regarding veterans' employment. *See Lahr*, 569 F.3d at 981 ("[t]he documents must be prepared to assist an agency decision-maker in arriving at a future particular decision").

- Exemplar 6 is a "two-page draft strategy, entitled 'AO-Managing FTE Levels (Revised 12-5-17).docx,' which was shared . . . within the EPA Office of Administrative and Executive Services . . ." *Vaughn* Index 398. According to EPA, the information "is pre-decisional because it was created for the purpose of assisting OEX managers in developing a strategy for managing FTE levels in OEX within the Office of the Administrator" and "contains proposal and options for managing pending and future personnel requests." *Id*. As

United States District Court
Northern District of California

discussed above, EPA has not established that discussions regarding general personnel matters and hiring plans fall within the deliberative process privilege as they do not bear on "the process by which policy is formulated" or "reveal [EPA's] mode of formulating or exercising policy-implicating judgment." *See Petroleum Info. Corp.*, 976 F.2d at 1435. Further, the *Vaughn* index does not provide information about an identifiable later decision regarding managing FTE levels. *See Lahr*, 569 F.3d at 981 ("[t]he documents must be prepared to assist an agency decision-maker in arriving at a future particular decision").

- Exemplar 7 is a "three-page, draft document that is entitled 'Summary of Impacts of Reduced FTE Levels'" that "lay[s] out preliminary thoughts on the impact of reducing FTEs in the specific offices." *Vaughn* Index 408. EPA states the "withheld information is pre-decisional because it was created for the purpose of assisting OA managers in developing a plan for managing FTE levels in OA," and was shared in November 2017 to "serve as discussion pieces that will assist decisionmakers as they assess the staffing needs of various offices in the OA." *Id*. As discussed above, EPA has not established that discussions regarding general personnel matters and hiring plans fall within the deliberative process privilege as they do not to bear on "the process by which policy is formulated" or "reveal [EPA's] mode of formulating or exercising policy-implicating judgment." *See Petroleum Info. Corp.*, 976 F.2d at 1435. Further, the *Vaughn* index does not provide information about an identifiable later decision regarding "managing FTE levels in OA." *See Lahr*, 569 F.3d at 981 ("[t]he documents must be prepared to assist an agency decision-maker in arriving at a future particular decision").

- Exemplar 8 is a "three-page, draft document that is entitled 'OA Major Issues.docx'" that was attached to emails dated April 4, 2017. *Vaughn* Index 418. EPA states "[t]he withheld information is pre-decisional because it was created for the purpose of assisting EPA senior leaders in understanding each office's major program activities, highlighting major issues and concerns in those programs," and that "the withheld information contains analysis that support the business case for presenting a business case for OA to maintain its resources." *Id*. The document "serve[d] as a discussion piece that will assist

7

decisionmakers in accessing the staffing needs of various offices in the OA." *Id.* As discussed above, EPA has not established that discussions regarding "staffing needs" fall within the deliberative process privilege as they do not bear on "the process by which policy is formulated" or "reveal [EPA's] mode of formulating or exercising policy-implicating judgment." *See Petroleum Info. Corp.*, 976 F.2d at 1435. Further, the *Vaughn* index does not provide information about an identifiable later decision regarding "the staffing needs of various offices in the OA." *See Lahr*, 569 F.3d at 981 ("[t]he documents must be prepared to assist an agency decision-maker in arriving at a future particular decision").

- ERF Exemplar 1 is an August 8, 2017 email "concerning the departure of an EPA employee, and discussing options for getting help with Human Resources (HR) work after the employee departs" EPA. *Vaughn* Index 16. According to EPA, it withheld a portion of the email "because it reflects internal Agency advice, recommendations, and opinions relating to personnel decisions, and considerations regarding Agency organization and structure" and "reflects only the thoughts and opinions of Agency staff engaged in weighing options for how to address the work responsibilities of a departing Agency employee after that employee has left the Agency." *Id.* As discussed above, EPA has not established that discussions regarding "how to address the work responsibilities of a departing Agency employee" fall within the deliberative process privilege as they do not bear on "the process by which policy is formulated" or "reveal [EPA's] mode of formulating or exercising policy-implicating judgment." *See Petroleum Info. Corp.*, 976 F.2d at 1435. Further, the *Vaughn* index does not provide information about an identifiable later decision regarding this issue. *See Lahr*, 569 F.3d at 981 ("[t]he documents must be prepared to assist an agency decision-maker in arriving at a future particular decision").

### ii. VERA/VSIP

The remaining six documents in this group constitute communications and/or draft documents related to EPA's offering of Voluntary Early Retirement Authority ("VERA") and

Voluntary Separation Incentive Payment Authority ("VSIP") in 2014 and 2017. Daniel Coogan, Acting Director of the Office of Resources and Business Operations within the Office of Mission Support, explains that VERA "allows agencies that are undergoing substantial restructuring, reshaping, downsizing, transfer of function, or reorganization to temporarily lower the age and service requirements in order to increase the number of employees who are eligible for retirement." Coogan Decl. ¶¶ 1, 55. VSIP, which is "also known as buyout authority, allows agencies that are downsizing or restructuring to offer employees lump-sum payments as an incentive to voluntarily separate." Id. at ¶ 55. The United States Office of Personnel Management ("OPM") and Office of Management and Budget ("OMB") "must approve an agency's VERA/VSIP business case before an agency may implement a VERA/VSIP offering." Id.

In connection with EPA's 2017 VERA/VSIP offering, Coogan states that "each EPA region and program office submitted a proposed VERA/VSIP business case to EPA Headquarters," which then provided feedback and proposed edits regarding the draft business case documents. Id. "After this internal editing process, all of the regions' and program offices' business cases were consolidated into one document, EPA's consolidated VERA/VSIP business case," and beginning on June 16, 2017, EPA submitted drafts of the consolidated VERA/VSIP business case to OPM and OMB. EPA submitted its business case to OPM and OMB on July 7, 2017. Id. ERF states that OMB provided its final approval of EPA's VERA/VSIP proposal on the same day, July 7, 2017, and that OPM provided its approval on July 10, 2017. [Docket No. 98 (Sproul Decl., Jul. 2, 2020) ¶¶ 43, 44.]

EPA's declarations do not address a separate VERA/VSIP offering but based on the court's review of the documents submitted for in camera review, it appears that EPA also offered VERA/VSIP in 2014. See, e.g., ERF Exemplar 3.

Notably, ERF does not challenge EPA's withholding of certain documents related to the 2017 VERA/VSIP program as "failing to constitute an Agency decision for DPP purposes." See Pl.'s Cross-Opp'n and Reply 10. In other words, ERF agrees with EPA that the decision to proceed with offering VERA/VSIP in 2017 is a "decision" for purposes of the privilege. Given the parties' agreement, the court need not decide the issue of whether it constitutes a "decision"

under the deliberative process privilege.

EPA withheld the following VERA/VSIP-related documents on the basis of the deliberative process privilege:

- Exemplar 4 is an undated document containing questions from OMB and answers from EPA regarding an unspecified VERA/VSIP business case submission that "reflects preliminary thoughts, recommendations, and opinions that were considered as part of the Agency's decision-making process for responding to OPM and OMB's comments concerning EPA's VERA/VSIP business case." *Vaughn* Index 71. The document is not marked "draft" and appears to be EPA's final answers to the questions posed by OMB after EPA had already submitted its business case. The document is therefore not "predecisional" or "deliberative." EPA has also not established that a decision about how to answer the OMB's questions about the VERA/VSIP business case is the type of decision within the scope of the deliberative process privilege, and EPA offers no authority supporting its decision to withhold the document.

- Exemplar 9 is "the initial draft narrative for OECA's VERA/VSIP business case" that was attached to a May 4, 2017 email and "served as preliminary starting point for OEI's VERA/VSIP submission." *Vaughn* Index 428. While the document appears to be both predecisional and deliberative, EPA's articulation of the foreseeable harm that would result from disclosure falls short of the mark. It states only that "[r]elease of the withheld information would have a chilling effect on Agency decision-making processes, and on the Agency's ability to have open and frank discussions and consultations concerning what to consider and how to present information in a VERA/VSIP business case . . ." *Id.* at 429. This is boilerplate and fails to connect the harm in a meaningful way to the information withheld. *See Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106.

- ERF's Exemplar 2 is an email chain dated July 13, 2017 "concerning what to include in the tracker for VERA/VSIP applications." *Vaughn* Index 115. EPA redacted portions of two emails in the chain. According to EPA, the redacted portions of the

emails are "deliberative because EPA employees and managers were internally considering how to properly track applicants and other personnel related questions concerning the implementation of the VERA/VSIP offering at the Agency." *Id*. These emails post-date OMB and OPM's final approval of EPA's VERA/VSIP business case. EPA has not established that a decision about the logistics of *how* to implement the VERA/VSIP offering, separate and apart from the decision of whether to offer VERA/VSIP to employees, is the type of decision within the scope of the deliberative process privilege, and EPA offers no authority supporting its decision to withhold the document.

- ERF's Exemplar 3 is an undated draft of a letter reminding employees of the March 5, 2014 final date to apply for VERA/VSIP. *Vaughn* Index 130. Although the *Vaughn* index provides few details about the context of this document, it appears that this document post-dates a decision to offer VERA/VSIP in 2014. EPA has not established that a decision about the logistics of *how* to implement the VERA/VSIP offering, separate and apart from the decision of whether to offer VERA/VSIP to employees, is the type of decision within the scope of the deliberative process privilege, and EPA offers no authority supporting its decision to withhold the document.

- ERF's Exemplar 4 is an undated draft of a letter written to employees to explain the 2014 VERA/VSIP offering. *Vaughn* Index 131. According to EPA, the document "reflects pre-decisional deliberations" regarding "how to present the VERA/VSIP information to employees, and what should be included in such a communication." *Id*. EPA has not established that a decision about the logistics of *how* to implement the VERA/VSIP offering, separate and apart from the decision of whether to offer VERA/VSIP to employees, is the type of decision within the scope of the deliberative process privilege, and EPA offers no authority supporting its decision to withhold the document.

- ERF's Exemplar 5 is an email chain containing seven emails "discussing a draft communication for senior leadership on the VERA/VSIP revised schedule and eOPF."

*Vaughn* Index 366. The emails are dated July 19, 2017. EPA redacted a portion of one of the emails in the chain; it states "[t]he withheld information . . . reflects pre-decisional deliberations among EPA staff and superiors regarding EPA's VERA/VSIP offering and decisions related to how the Agency would implement VERA/VSIP." *Id.* The email chain post-dates OMB and OPM's final approval of EPA's VERA/VSIP business case. EPA has not established that a decision about the logistics of *how* to implement the VERA/VSIP offering, separate and apart from the decision of whether to offer VERA/VSIP to employees, is the type of decision within the scope of the deliberative process privilege, and EPA offers no authority supporting its decision to withhold the document.

**b.        Responses to Oversight, Investigations, and the Media**

The next group of exemplars that EPA withheld on the basis of the deliberative process privilege include documents and communications regarding questions by congressional committees, responses to investigations, press inquiries, and public statements. Eleven of the 23 documents withheld on the basis of the deliberative process privilege fall into this category.

For example, Exemplar 11 is a "draft of potential questions that then-Administrator Pruitt may face in upcoming Congressional oversight and budget hearings" dated April 16, 2018. *Vaughn* Index 1023. EPA states that the document "reflects internal agency analyses, advice, and recommendations relating to possible questions that former Administrator Scott Pruitt could be asked at upcoming Congressional hearings and suggested answers." *Id.* The questions cover a variety of subjects including ethics, spending, personnel, use of email, and travel practices. Similarly, Exemplar 12 is a "draft version of a letter to House of Representatives Committee on Oversight and Government Reform Chairman Trey Gowdy" that "was written to answer questions . . . about former Administrator Pruitt's use of first-class seating when flying for EPA business." *Vaughn* Index 1031. According to EPA, the document "reflects internal agency analyses, advice, and recommendations on a draft response to Representative Gowdy." It "was created for the purpose of assisting EPA staff in reaching a decision on what information to include in the draft letter" and assisted "agency decision-maker Ryan Jackson in that regard." *Id.*

These documents do not fall within the deliberative process privilege.  Generally, preparation for testimony before Congress and responses to questions from lawmakers regarding issues other than substantive policy issues or EPA's statutory duties do not bear on "the process by which policy is formulated" or "reveal [EPA's] mode of formulating or exercising policy-implicating judgment."  *See Petroleum Info. Corp.*, 976 F.2d at 1435.  In fact, these documents reflect discussions about how to communicate decisions that EPA and Pruitt had already made and actions they had already taken, and thus do not qualify as predecisional.  As the Ninth Circuit has explained, "the purpose of the deliberative process privilege is to protect the quality of an agency's decision; revealing 'communications made after the decision and designed to explain it' do not affect a decision's quality."  *Lahr*, 569 F.3d at 981-82 (quoting *N.L.R.B. v. Sears*, 421 U.S. 132, 152 (1975)).  Several courts in this circuit have concluded that similar materials do not qualify for the privilege for that reason.  *See, e.g., Riverkeeper v. U.S. Army Corps of Eng'rs*, 38 F. Supp. 3d 1207, 1219-20 (D. Or. 2014) (holding that draft communications materials were not "predecisional in any meaningful sense"); *Chattler*, 2009 WL 1313227, at *2 (holding that "preparations related to testimony before Congress or statements to Congress or the public (including press releases) . . . do not seem to be decisions akin to policymaking" for purposes of the privilege); *First Resort, Inc. v. Herrera*, No. CV 11-5534 SBA (KAW), 2014 WL 988773, at *4 (N.D. Cal. Mar. 10, 2014) (finding that a draft press release was not protected by the privilege as it was not predecisional and played no role in policy formulation); *Mansourian v. Bd. of Regents of Univ. of Cal. at Davis*, No. CIVS 03-2591 FCD EFB, 2007 WL 4557104, at *5 (E.D. Cal. Dec. 21, 2007) (documents used "to prepare for legislative testimony concerning past actions and decisions that were the subject of pending lawsuits" were not predecisional; rather, "the documents were used to prepare for a post hoc explanation of past actions").

On the current record, the court finds that EPA has not established that the deliberative process privilege applies to shield Exemplars 11 and 12 from production.  EPA withheld the following documents on similar grounds:

- Exemplar 13 is an email chain dated March 26, 2018 discussing how to respond to "a media inquiry from the Wall Street Journal asking for comment on the former

13

1    Administrator's travel records." *Vaughn* Index 1055.  For the reasons discussed above,

2    EPA has not established that communications about how to respond to the media

3    regarding issues other than substantive policy matters or EPA's statutory duties bear on

4    "the process by which policy is formulated" or "reveal [EPA's] mode of formulating or

5    exercising policy-implicating judgment." *See Petroleum Info. Corp.*, 976 F.2d at 1435;

6    *Riverkeeper*, 38 F. Supp. 3d at 1219-20.  Instead, they were for the purpose of

7    "prepar[ing] for a post-hoc explanation of past actions." *See Mansourian*, 2007 WL

8    4557104, at *5.  Accordingly, the emails do not fall within the deliberative process

9    privilege.

10   • Exemplars 14, 16, and 17 are different threads of an email chain from April 2018

11   "discussing the response to a draft report by [Office of Inspector General] investigating

12   salary increases for seven employees in administratively appointed positions." *Vaughn*

13   Index 1122, 1130, 1133.  EPA redacted portions of the emails that "contain[ ] internal

14   agency discussions reflecting analyses, advice, and recommendations relating to EPA's

15   review of the OIG draft report" and "suggest[ ] language to respond to any media

16   inquiries that the Agency may receive in response to the release of the final OIG

17   report." *Id*. at 1123, 1131, 1133-34.  For the reasons discussed above, EPA has not

18   established that communications about how to respond to OIG and the media regarding

19   issues other than substantive policy matters or EPA's statutory duties bear on "the

20   process by which policy is formulated" or "reveal [EPA's] mode of formulating or

21   exercising policy-implicating judgment." *See Petroleum Info. Corp.*, 976 F.2d at 1435;

22   *Riverkeeper*, 38 F. Supp. 3d at 1219-20.  Instead, they were for the purpose of

23   "prepar[ing] for a post-hoc explanation of past actions." *See Mansourian*, 2007 WL

24   4557104, at *5.  Accordingly, the emails do not fall within the deliberative process

25   privilege.

26   • Exemplar 15 is an email chain from April 3, 2018 "discussing a public statement to be

27   released concerning the Agency's authority to offer raises under the Safe Drinking

28   Water Act to employees." *Vaughn* Index 1127.  According to EPA, the redacted

14

portions of the emails "contain[ ] internal agency discussions reflecting analyses, advice, and recommendations relating to EPA's public relations strategy concerning the Agency's authority under SDWA to offer raises to employees." *Id*. For the reasons discussed above, EPA has not established that communications about a public relations strategy regarding employee raises bear on "the process by which policy is formulated" or "reveal [EPA's] mode of formulating or exercising policy-implicating judgment." *See Petroleum Info. Corp*., 976 F.2d at 1435; *Riverkeeper*, 38 F. Supp. 3d at 1219-20. Accordingly, the emails do not fall within the deliberative process privilege.

- EPA's Alternate Exemplar 1 is an email chain from April 18, 2018 "proposing a response to a press inquiry from the Associated Press concerning former Administrator Pruitt's travel." *Vaughn* Index 1036. EPA states the redacted portions of the emails "contain[ ] internal agency discussions reflecting staff analyses, advice, and recommendations relating to EPA's communications and public relations strategy concerning former Administrator Pruitt's travel." *Id*. For the reasons discussed above, EPA has not established that communications about a public relations strategy and how to respond to a press inquiry regarding issues other than substantive policy matters or EPA's statutory duties bear on "the process by which policy is formulated" or "reveal [EPA's] mode of formulating or exercising policy-implicating judgment." *See Petroleum Info. Corp*., 976 F.2d at 1435; *Riverkeeper*, 38 F. Supp. 3d at 1219-20. Instead, they were for the purpose of "prepar[ing] for a post-hoc explanation of past actions." *See Mansourian*, 2007 WL 4557104, at *5. Accordingly, the emails do not fall within the deliberative process privilege.
- EPA's Alternate Exemplar 3 is "a draft summary of deliberative comments from Ryan Jackson relating to the Agency's response to an OIG audit concerning the Agency's hiring authority under the Safe Water Drinking Act." *Vaughn* Index 1172. According to EPA, the document includes "draft audit responses and additional comments on the draft response." *Id*. For the reasons discussed above, EPA has not established that internal analyses and recommendations how to respond to OIG regarding issues other

15

than substantive policy matters or EPA's statutory duties bear on "the process by which policy is formulated" or "reveal [EPA's] mode of formulating or exercising policy-implicating judgment." *See Petroleum Info. Corp.*, 976 F.2d at 1435; *Riverkeeper*, 38 F. Supp. 3d at 1219-20. Instead, they were for the purpose of "prepar[ing] for a post-hoc explanation of past actions." *See Mansourian*, 2007 WL 4557104, at *5. Accordingly, the draft summary does not fall within the deliberative process privilege.

- ERF Exemplar 6 is an email chain dated March 7, 2018 discussing which information to include with a Presidential Rank Award nomination for Donna Vizian, Principal Deputy Assistant Administrator for OARM and "how to characterize that information." *Vaughn* Index 440. According to EPA, the redacted portions of the emails "reflect[] pre-decisional deliberations" about "which type of information to include within the nomination document." *Id.* EPA has not established that discussions regarding which information to include with a Presidential Rank Award nomination for an EPA employee fall within the deliberative process privilege as they do not bear on "the process by which policy is formulated" or "reveal [EPA's] mode of formulating or exercising policy-implicating judgment." *See Petroleum Info. Corp.*, 976 F.2d at 1435. Moreover, it appears that these emails post-date the decision to nominate the employee for the award, and EPA has not established that a decision about how to justify the nomination is the type of decision within the scope of the deliberative process privilege. Accordingly, the email chain does not fall within the deliberative process privilege.

- ERF Exemplar 7 is an email chain dated February 8, 2018 "consisting of a discussion among staff of EPA's Office of Public Affairs (OPA) regarding how to respond to several questions from a reporter about EPA employee morale." *Vaughn* Index 759. EPA states the redacted portions of the emails "consist of pre-decisional deliberations among EPA staff regarding forming a response to the questions posed by the reporter" about employee morale. *Id.* For the reasons discussed above, EPA has not established that communications about how to respond to a press inquiry regarding issues other

than substantive policy matters or EPA's statutory duties bear on "the process by which policy is formulated" or "reveal [EPA's] mode of formulating or exercising policy-implicating judgment." *See Petroleum Info. Corp.*, 976 F.2d at 1435; *Riverkeeper*, 38 F. Supp. 3d at 1219-20. Accordingly, the emails do not fall within the deliberative process privilege.

### 2. Attorney-Client Privilege

EPA withheld two of the documents submitted for in camera review in whole or in part based on the attorney-client privilege. The attorney-client privilege protects "confidential communications between attorneys and clients, which are made for the purpose of giving legal advice." *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011) (citation omitted); *see Vasudevan Software, Inc. v. IBM Corp.*, No. 09-cv-5897-RS (PSG), 2011 WL 1599646, at *1 (N.D. Cal. Apr. 27, 2011). The attorney-client privilege applies under the following circumstances: (1) legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived. *Richey*, 632 F.3d at 566 (brackets, citation, and quotation marks omitted). The privilege is "narrowly and strictly construed," and the party asserting it bears the burden of proving that it applies. *Vasudevan Software*, 2011 WL 1599646, at *1 (footnotes and quotation marks omitted); *accord United States v. Bergonzi*, 216 F.R.D. 487, 493 (N.D. Cal. 2003) (holding that party asserting privilege "must make a prima facie showing" that privilege applies) (citing *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992)); *see Richey*, 632 F.3d at 566. The privilege protects only communications, and not underlying facts. *Upjohn v. United States*, 449 U.S. 383, 396 (1981) (finding that a party "may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney") (citations omitted). "The privilege extends to agencies as well to the extent the agency is consulting its attorney 'as would any private party seeking advice to protect personal interest.'" *Our Children's Earth Found.*, 85 F. Supp. 3d at 1086 (quoting *Ctr. for Bio. Diversity v. Office of Mgmt. & Budget*, 625 F. Supp. 2d 885, 892

1   (N.D. Cal. 2009) (quotation marks and citation omitted)). "To support claims of attorney-client

2   privilege, the agency must, in its *Vaughn* index, 'show that these documents involved the

3   provision of specifically *legal* advice or that they were intended to be confidential and were kept

4   confidential.'" *Id.* (quoting *Nat'l Resources Def. Council v. U.S. Dep't of Def.,* 388 F. Supp. 2d

5   1086, 1104 (C.D. Cal. 2005) (emphasis in original) (quotation omitted)).

6        EPA is withholding a portion of Exemplar 2, an email chain, on the basis of the attorney-

7   client privilege. EPA has redacted a portion of a June 6, 2017 email from Robert D. Coomber,

8   Senior Labor Attorney, Labor and Employee Relations Division, to seven individuals with EPA

9   email addresses. In his email, Coomber references "a memorandum on union notice re

10  VERA/VSIP," and EPA has redacted Coomber's brief summary of his advice. EPA states the

11  redacted portion of the email constitutes "legal advice provided by Robert Coomber in his capacity

12  as Senior Labor Attorney" in response to a request for such advice "on the Agency's legal

13  obligations concerning its notice to unions regarding VERA/VSIP," and that the attorney-client

14  privilege has not been waived.

15       Exemplar 3, which EPA is withholding in its entirety, appears to be the memo referenced

16  by Coomber in the June 6, 2017 email. It is a memo dated June 6, 2017 by Coomber and

17  addressed to Donna Vizian, Acting Assistant Administrator, OARM, an office within EPA. The

18  subject is "Union Notice re VERA/VSIP." EPA states that the attorney-client privilege over the

19  memo has not been waived.

20       The court finds that EPA properly invoked the attorney-client privilege as to Examples 2

21  and 3. The June 6, 2017 email and memo are between an EPA attorney and EPA employees and

22  are confidential communications related to the provision of legal advice with respect to

23  VERA/VSIP.

24       Turning to foreseeable harm, EPA may not withhold these documents "unless the agency

25  also shows that disclosure will harm the interest protected by" Exemption 5. *See Ctr. for*

26  *Investigative Reporting*, 424 F. Supp. 3d at 780. Neither the White nor the Coogan declarations

27  describe any foreseeable harm that would result from disclosure. *See* White Decl. ¶¶ 48-51;

28  Coogan Decl. ¶ 53. Further, EPA's *Vaughn* index does not set forth a clear statement regarding

the harm that would result from disclosure of attorney-client privileged communications. The corresponding entries address only the segregability of the factual material in the documents: "[r]elease of the factual material" in the documents "would . . . deprive the Agency of the benefit of confidential legal advice by allowing the scrutiny of the select client-supplied facts that informed the specific legal advice from the EPA attorney." *Vaughn* Index 53-54. This fails to address the harm that would result if the legal advice itself were disclosed, and EPA offers no authority that it need not comply with the requirements of the FIA for documents withheld on the basis of the attorney-client privilege. Given its failure to describe any foreseeable harm that would result from disclosure, EPA may not withhold these documents.

### 3. Presidential Communications Privilege

EPA withheld portions of ERF's Exemplar 8, pages from former Administrator Pruitt's calendar, based on the presidential communications privilege. The presidential communications privilege is a "presumptive privilege for [p]residential communications" that "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially." *Karnoski v. Trump*, 926 F.3d 1180, 1203 (9th Cir. 2019) (quoting *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974))). The presidential communications privilege protects the following materials:

> [C]ommunications directly involving and documents actually viewed by the President, as well as documents solicited and received by the President or his immediate White House advisers [with] . . . broad and significant responsibility for investigating and formulating the advice to be given the President. The privilege covers documents reflecting presidential decision making and deliberations, regardless of whether the documents are predecisional or not, and it covers the documents in their entirety.

*Karnoski*, 926 F.3d at 1203 (quoting *Loving*, 550 F.3d at 37-38 (internal quotation marks and citations omitted). "[T]he presidential communications privilege should be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected." *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997)

Here, the redacted portions of ERF's Exemplar 8 reflect a communication directly involving former President Trump. They are therefore protected by the presidential

communications privilege. However, neither the *Vaughn* index nor the relevant portion of the White declaration addresses foreseeable harm. *See* White Decl. ¶ 52. In the absence of a showing of foreseeable harm to an interest protected by the exemption, EPA may not withhold any portions of the document.

**B.      Exemption 6**

EPA withheld portions of five of the documents submitted for in camera review based on FOIA Exemption 6, which exempts from production "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Under Ninth Circuit law, "[t]he phrase 'similar files' has a broad, rather than a narrow meaning," such that "[g]overnment records containing information that applies to particular individuals satisfy the threshold test of Exemption 6." *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1024 (9th Cir. 2008) (second alteration in original, quotation marks and citations omitted).

If records satisfy this threshold test, the court must next consider whether disclosure of the information "would constitute a *clearly unwarranted* invasion of personal privacy." *Id.* (emphasis added) (quoting 5 U.S.C. § 552(b)(6)). "[T]o determine whether a record is properly withheld, [courts] must balance the privacy interest protected by the exemptions against the public interest in government openness that would be served by disclosure." *Lahr*, 569 F.3d at 973. "Once the government has identified a cognizable privacy interest, 'the *only* relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to.'" *Id.* (emphasis in original) (quoting *Bibles v. Or. Natural Desert Ass'n,* 519 U.S. 355, 355-56 (1997)). "In other words, information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct is not the type of information to which FOIA permits access." *Forest Serv. Emps.*, 524 F.3d at 1025 (quotation marks and citations omitted).

- Exemplar 13 is an email chain dated March 26, 2018 about how to respond to "a media inquiry from the Wall Street Journal asking for comment on the former Administrator's

travel records." *Vaughn* Index 1055. EPA redacted the Wall Street Journal reporter's phone numbers under Exemption 6, although it did not redact the reporter's name and email address. According to EPA, "Plaintiff has indicated that it intends to use the phone numbers to contact the individual if released," and "[t]he reporter has a significant personal privacy interest in preventing the harassment that will occur in the form of burdensome, unsolicited phone calls that will result from disclosure of the phone numbers." *Id.* at 1055-56. White also states that EPA withheld the phone numbers "[b]ecause uninvited contact by phone is far more invasive than by email." White Decl. ¶ 54. Here, the reporter affirmatively contacted EPA in a professional context—a request for EPA's position on a particular issue related to former Administrator Pruitt. EPA has already disclosed the reporter's name, news organization, and email address in the same email chain. Given this context, the court sees no meaningful difference between the reporter's email address and phone numbers. Therefore, EPA has not established that releasing the phone numbers is a "clearly unwarranted invasion of personal privacy."

- Exemplar 19 is an email chain consisting of a resignation email from an EPA employee to an unspecified number of other EPA employees, and a second email forwarding the resignation email to another EPA employee. *Vaughn* Index 736. EPA redacted personal details and identifying information, including "the employee's name, personal contact information, job title and location, length of employment, resignation date, the reason for leaving the Agency, which, in its entirety, is personal in nature, plans after resignation from the Agency, the employee's signature, date of email, and the email recipients." *Id.* Having reviewed the emails in camera, the court concludes that the disclosure of the redacted portions "would constitute a clearly unwarranted invasion of personal privacy," and that EPA's articulation of the harm that is likely to result from disclosing the personal information therein—that is, "embarrassment or harassment"— is sufficient to justify withholding the information. The court also notes that ERF only seeks "departure records for individuals that left EPA for political reasons." Pl.'s

21

Cross-Opp'n and Reply 17. These emails do not fall into that category.

- EPA's Alternate Exemplar 2 is "a letter from an EPA employee providing to the Agency their notice of resignation, resignation date, and providing a brief statement identifying their reasons for leaving the agency." *Vaughn* Index 745. EPA redacted "personal details and identifying information, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," including "the employee's name, personal contact information, job title, division within the Agency, resignation date, the employee's signature, date of letter, and the letter recipients and their contact information." *Id*. ERF does not challenge the withholding of the former employee's name and contact information. Pl.'s Cross-Opp'n and Reply 16. EPA contends that the harm that would result from disclosing the information "could subject the employee to embarrassment or harassment," but this appears to be entirely unsupported as ERF does not seek production of the individual's name. Therefore, EPA has not established that releasing information other than the individual's name and contact information is a "clearly unwarranted invasion of personal privacy" or would result in harm to the interests protected by Exemption 6.

- ERF's Exemplar 9 is pages from Former Administrator Pruitt's calendar. *Vaughn* Index 1165. EPA redacted Pruitt's email address, the names of two restaurants at which Pruitt dined, and the email address for one of the individuals with whom he dined, described as a "personal friend[]" (although it did not redact not the individual's name). According to EPA, Pruitt "has a privacy interest in information regarding where he dined," and "[d]isclosure of the dining locations shed no light on Agency business." *Id*. ERF challenges only EPA's redaction of the restaurant names. [*See* Docket No. 98-1 at ECF p. 2160.] EPA's withholding of this information is not justified, as it does not articulate any harm that would result from disclosing the information.

- ERF's Exemplar 10 is an email chain with two emails. EPA describes the document as follows: "one email from an EPA employee to a resigning EPA employee requesting

22

completion of a resigning employee checklist, and one reply email from the resigning EPA employee acknowledging completion of the resigning employee checklist." *Vaughn* Index 721. It states "[t]he withheld portion of the email contains personal details and identifying information." *Id*. However, the document that EPA submitted for in camera review as ERF's Exemplar 10 does not appear to correspond to this entry. Although the bates numbers of the document correspond to the *Vaughn* index entry (EcoRights_01.31.20 Production0003-0005), the emails contain no reference to a "resigning employee checklist." Accordingly, the court is unable to evaluate EPA's withholding of this document on the basis of the claimed FOIA exemption.

## III. CONCLUSION

In sum, the court concludes that EPA has failed to establish that it properly withheld all of the exemplars submitted for in camera review, with the exceptions of Exemplar 19 and ERF Exemplar 10. By no later than June 8, 2021, EPA shall produce to ERF all 28 exemplars that it improperly withheld. Having provided rulings regarding EPA's exemption and foreseeable harm arguments for the 30 documents submitted for in camera review, the court now orders the following: using the rulings provided in this order and applying them as guidance across the universe of withheld documents, EPA shall re-review each of the documents it is withholding based on any claimed FOIA exemptions in light of the authority discussed above. Within 14 days of the date of this order, EPA shall produce to ERF any and all documents for which it withdraws its exemption claims. Within 21 days of the date of this order, EPA shall produce a revised *Vaughn* index to ERF. EPA's revised *Vaughn* index must contain individually-numbered entries, and must make clear which documents EPA is continuing to withhold and the total number of documents and pages that it is withholding.

Following production of the revised *Vaughn* index, the parties shall meet and confer about any remaining withholdings. Based on the court's review of the 30 exemplars, it appears likely that EPA over-withheld documents responsive to ERF's FOIA requests. Therefore, the court anticipates that EPA's re-review of the withheld documents will address all or nearly all of the parties' remaining disputes about withheld documents. However, if disputes remain after meeting

and conferring, the parties shall submit a joint letter setting forth a proposal for how the court may efficiently resolve any outstanding disputes. Any such joint letter may not exceed two pages, and must be filed within 21 days of the date of EPA's production of a revised *Vaughn* index. If the parties are unable to agree to a joint proposal, the joint letter shall describe their individual proposals. The court will issue further instructions upon review of the joint letter.

**IT IS SO ORDERED.**

Dated: June 3, 2021



Donna M. Ryu
United States Magistrate Judge